998 F.2d 120
 143 L.R.R.M. (BNA) 2827, 125 Lab.Cas. P 10,760
 UNITED STATES of America, Plaintiff-Appellee,
and
Investigations Officer, Claimant-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO, et
al., Defendants,
and
Bernard Adelstein, Appellant.
 No. 1609, Docket 93-6030.
 United States Court of Appeals,
Second Circuit.
 Argued May 25, 1993.
Decided July 13, 1993.
 
 Barry Ivan Slotnick, New York City (Slotnick & Baker, Michael Shapiro, Stuart Abrams, of counsel, Kenneth Ashford, Law Student), for appellant.
 Celia A. Zahner, New York City, Sp. Counsel, Investigations Officer (Charles M. Carberry, Investigations Officer, Marla S.K. Gale, Jones, Day, Reavis & Pogue, of counsel), for claimant-appellee.
 Christine H. Chung, New York City, Asst. U.S. Atty. S.D. New York, Roger S. Hayes, U.S. Atty. S.D. New York, Steven C. Bennett, Asst. U.S. Atty., of counsel), for plaintiff-appellee.
 Before: FEINBERG, NEWMAN and KEARSE, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 This appeal is another in a series stemming from the 1989 consent decree (the Consent Decree) that settled civil racketeering charges brought by the government against the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union or IBT) and members of the Union's General Executive Board. We assume familiarity with the remedial structure established by the Consent Decree. See, e.g., United States v. International Bhd. of Teamsters (Election Rules Order), 931 F.2d 177, 180-81 (2d Cir.1991); United States v. International Bhd. of Teamsters (Friedman & Hughes), 905 F.2d 610, 612-13 (2d Cir.1990).
 
 
 2
 Bernard Adelstein, a former member and officer of IBT Local 813 (the Local), appeals from an order of the United States District Court for the Southern District of New York, David N. Edelstein, J., upholding disciplinary sanctions imposed on him. Adelstein argues that the decision of the Independent Administrator (the Administrator) was arbitrary and capricious and that he was denied a "full and fair" hearing as required by § 101(a)(5) of the Labor-Management Reporting and Disclosure Act (the Act). 29 U.S.C. § 411(a)(5). For the reasons set forth below, we affirm.
 
 I. Background
 
 3
 Bernard Adelstein was formerly Secretary-Treasurer of the Local, which represents sanitation workers employed by private firms in the New York City area.[1] Adelstein has held a high-ranking position in the Local continuously since it was formed in 1951, and has long been the Local's main negotiator. Negotiations on behalf of employers in the private sanitation industry, acting through a trade association known as the Trade Waste Association, were conducted by James Failla, also known as Jimmy Brown, a reputed member of La Cosa Nostra.
 
 
 4
 The Investigations Officer charged Adelstein with violating Article II, § 2(a) and Article XIX, §§ 6(b)(1)-(2) of the Union Constitution "by conducting [himself] in a manner to bring reproach upon the IBT and by violating [his] oath." Article II, § 2(a) is the Union membership oath, which provides in relevant part that every Union member shall "conduct himself or herself in a manner so as not to bring reproach upon the Union." Article XIX, § 6(b)--redesignated § 7(b) by amendments made in 1991--is a non-exhaustive list of disciplinary charges that may be filed against Union members, among which is the charge that the member has violated his oath. Adelstein was charged specifically with bringing reproach upon the Union by knowingly associating with Failla and other reputed members of organized crime. Following a hearing, the Administrator found that Adelstein knew Failla was a member of organized crime and that his "purposeful associations" with Failla were "so deep-rooted" that it was unnecessary to decide whether Adelstein was also guilty of the other proscribed associations with which he had been charged.
 
 
 5
 The Investigations Officer presented his case against Adelstein through the declaration of FBI Special Agent Brian Taylor, supplemented by Taylor's testimony on cross-examination. Accepted by the Administrator as "an expert on the structure, activities and membership of La Cosa Nostra," Taylor identified Failla as a member of the Gambino Crime Family. The declaration submitted by Taylor contained several items of hearsay evidence, which Adelstein argues were unreliable.
 
 
 6
 The first was the March 1992 testimony of Salvatore Gravano, a member of the Gambino Family, given in the racketeering trial of John Gotti and Frank Locascio. Under direct examination about "other industries that the Gambino family controlled," Gravano testified that the "garbage industry" was controlled for the Family by Failla. According to Gravano, Failla was "head of the [Trade Waste] [A]ssociation and he controls the union, 813, Bernie Edelstein [sic] answers directly to Jimmy Brown so he controls the garbage industry for his family." When asked if he was "familiar with the details of how Jimmy Brown controlled the garbage haulers," Gravano answered "No."
 
 
 7
 The next hearsay evidence was a lengthy, detailed statement by Harold Kaufman, an administrative assistant to Local 813 during the mid-1970s, who later entered the Federal Witness Security Program. According to the statement:
 
 
 8
 I understood Bernie Adelstein to be an associate of the organized crime group known as the Gambino Family, who assisted the Gambino Family and other organized crime groups, including the Genovese Family and the Luchese Family, in controlling and manipulating the private sanitation industry in the New York City metropolitan area. Bernie Adelstein worked closely with James Failla, who is also known as "Jimmy Brown," to maintain organized crime domination of the private sanitation industry.... Bernie Adelstein and Failla were often in contact with each other, and would sometimes meet at a diner on Long Island.
 
 
 9
 * * * * * *
 
 
 10
 Through their mutual action and their control of Teamsters Local 813 and the New York City Trade Waste Association, Bernie Adelstein and Failla controlled the waste carting industry in New York City for the Gambino Family and the other interested organized crime groups. It was my understanding that Bernie Adelstein and Failla met at least every two weeks to discuss deals in the waste carting industry. Through its relationship with Bernie Adelstein, the Gambino Family was able to use Teamsters Local 813 to police the waste carting industry for its benefit and the benefit of other organized crime groups. Through his relationship with the Gambino Family, Bernie Adelstein received its support in keeping him in power in Teamsters Local 813, fighting off competition from other labor organizations, and settling problems with organized crime figures. Bernie Adelstein could rely on Failla to help him police the industry, since they had mutual interests in controlling the waste carting industry.
 
 
 11
 The Kaufman statement went on to explain how Failla and Adelstein used their positions to enforce a system of property rights in designated garbage collection "stops."
 
 
 12
 Also included in the Taylor declaration were transcripts of electronic surveillance tapes on which were recorded two separate conversations among various organized crimes figures. In the first, the late "Boss" of the Gambino Family, Paul Castellano, is overheard discussing with Failla, among others, a continuing "jurisdictional" dispute between Local 813 and rival Local 282. Although the transcript indicates that the recording was inaudible in places, Castellano is at one point clearly heard to say, referring to the two locals, "Well, you know, as far as I'm concerned, uh, we got control of both." In that same conversation, another interlocutor reports that John Gotti, then-underboss of the Gambino Family, had earlier met with Adelstein and an officer of Local 282 to "lay down the law" concerning their respective jurisdictions.
 
 
 13
 In the second transcript, Salvatore Avellino, a "capo" in the Luchese Crime Family who represented that family's interests in the garbage carting industry, is overheard discussing with two associates a dispute between the Luchese Family and the Gambino Family about control of the sanitation industry. The conversation revolved around Avellino's idea of creating a new local, which he proposed calling 813A, to be controlled by the Luchese Family, while leaving Local 813 under the control of the Gambino Family. At one point in the conversation, Avellino described Local 813 as "Jimmy Brown's [i.e., Failla's] union."
 
 
 14
 Finally, the Taylor declaration incorporated a declaration by FBI Agent Donald W. McCormick in which McCormick related the substance of an interview he and another agent conducted of Peter Chiodo, a self-admitted member of the Luchese Family. According to McCormick's declaration, Chiodo considered Failla "to be the dominant organized crime figure in the garbage carting industry in New York City," a position "derived from his control of International Brotherhood of Teamsters Local 813 and its secretary-treasurer, Bernie Adelstein."
 
 
 15
 Testifying at the hearing, Adelstein insisted that any suggestion he was "controlled" by Failla was a "lie." Adelstein did, however, acknowledge that he occasionally met with Failla, though he did not "know whether it was once a month, or at a funeral, or at an affair of some kind." Adelstein also admitted knowing that employers in the sanitation industry were represented by La Cosa Nostra members, but said he "didn't put them in the industry." Further, Adelstein did not dispute that he was familiar with allegations that the Local was involved with organized crime, but admitted that he never investigated. He "saw no reason for it."
 
 
 16
 In addition to the above-mentioned hearsay evidence and Adelstein's own testimony, the Administrator also considered, among other things, reports by the Senate Select Committee on Improper Activities in the Labor or Management Field, chaired by Senator John L. McClellan in the late 1950s and known as the McClellan Committee. The Committee's 1958 Interim Report found that
 
 
 17
 Bernard Adelstein, secretary-treasurer of teamsters local 813, the dominant union in New York carting, betrayed every principle of trade unionism by serving as an abject tool in all of [the] empire-building activities [of Vincent Squillante, a narcotics trafficker and mob figure]. With his own authority over Local 813 as absolute as Squillante's over the management side, Adelstein was able to put his union at Squillante's complete disposal in enforcing monopolies, punishing trade association critics of Squillante, and blinking at Squillante-favored nonunion firms.
 
 
 18
 * * * * * *
 
 
 19
 The committee finds that Secretary-Treasurer Adelstein of local 813 cynically sold out his own members by promoting the interests of nonunion firms dominated by underworld elements.
 
 
 20
 According to the Administrator, the evidence showed that Adelstein had "decades-long relationships with an entire cast of characters who were members of organized crime."
 
 
 21
 The Administrator upheld the Investigations Officer's charges, finding that Adelstein knew Failla was a member of organized crime but continued to associate with him anyway. The Administrator permanently barred Adelstein from the Union and extinguished any Union-related benefits to which he would otherwise have been entitled, including attorney's fees arising from the disciplinary proceeding. The district court affirmed the Administrator's decision.
 
 
 22
 This appeal followed.
 
 II. Discussion
 
 23
 The district court must give "great deference" to the decisions of the Administrator. See Friedman & Hughes, 905 F.2d at 616; accord United States v. International Bhd. of Teamsters (Sansone), 981 F.2d 1362, 1368 (2d Cir.1992). The standard of review used by this court is not settled. See, e.g., United States v. International Bhd. of Teamsters (Wilson, Dickens & Weber), 978 F.2d 68, 72 (2d Cir.1992); United States v. International Bhd. of Teamsters (Cimino), 964 F.2d 1308, 1311 (2d Cir.1992). We see no compelling need to settle it now, for we would affirm the decision of the district court under "any reasonable standard of review." Friedman & Hughes, 905 F.2d at 617.
 
 
 24
 At the threshold, Adelstein states that he never signed the Consent Decree, and so cannot be bound by its terms. We rejected this argument in Friedman & Hughes, specifically holding that a Union member "clearly could be bound by the terms of the disciplinary mechanism set in place by the Consent Decree." Id. at 622. This was so, we explained, because the Union had through the Consent Decree "merely exercised its discretionary authority under the [IBT] Constitution to delegate the investigation and discipline of union misconduct to the court-appointed officers." Id. at 623. We see no reason to depart from that holding today.
 
 A. Hearsay & Sufficiency of the Evidence
 
 25
 On the merits, Adelstein argues that the Administrator's decision was arbitrary and capricious. He argues first that the hearsay evidence was unreliable. Second, he argues that even if the objectionable hearsay is credited, the evidence was still insufficient to sustain the charges against him.
 
 1. Hearsay
 
 26
 IBT disciplinary proceedings are akin to administrative proceedings, see Wilson, Dickens & Weber, 978 F.2d at 72, in which the "rules governing the admission of evidence ... are considerably more relaxed." Rocker v. Celebrezze, 358 F.2d 119, 122 (2d Cir.1966) (footnote omitted). Accordingly, hearsay may be admitted in IBT disciplinary proceedings, provided it is reliable. See, e.g., Wilson, Dickens & Weber, 978 F.2d at 72; see also United States v. International Bhd. of Teamsters (Senese & Talerico), 941 F.2d 1292, 1298 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). Though "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence," Consolidated Edison Co. v. NLRB, 305 U.S. 197, 230, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), "reliable hearsay may constitute substantial evidence to support an administrative decision." Cimino, 964 F.2d at 1312 (citing Richardson v. Perales, 402 U.S. 389, 402-06, 91 S.Ct. 1420, 1427-30, 28 L.Ed.2d 842 (1971)).
 
 
 27
 Adelstein argues that the hearsay admitted here was unreliable for two principal reasons. First, he claims that none of it provided any detail about how he and the Local were controlled by Failla. Second, he claims that the notion he was under Failla's control was just "mob folklore," faithfully repeated by each hearsay declarant but without any basis in reality. Consequently, he argues, the several statements did not genuinely corroborate one another, despite the findings of the Administrator and district court to the contrary.
 
 
 28
 The extent to which hearsay statements corroborate each other is one measure of their reliability. Id. Here, each statement contains the information that Adelstein was under Failla's control. Adelstein tries to explain this convergence away by claiming that each declarant was only repeating "mob folklore." This theory is flawed, for at least two of the hearsay declarants--Castellano and Gravano--could be expected to know fact from folklore since the former was the "Boss" of the Gambino Family and the latter was described by Adelstein as "second-in-command." Nor was the Administrator required to believe that either was simply lying or bragging, even if, in Gravano's case, he was unable to recite the precise mechanisms of the Gambino Family's control over Adelstein. As the Administrator put it, "Listening to Castellano explain to mob associates that he has 'control' over Local 813 makes it clear that, as far as the 'Boss' of the Gambino Family was concerned, organized crime's infiltration into Adelstein's Local was far more than idle folklore."
 
 
 29
 Other statements possessed other indicia of reliability. For example, the Kaufman statement provided a relatively detailed account of how Adelstein used his position in the Local to help organized crime enforce a system of property rights in collection "stops." Such detail strengthens a statement's reliability. See, e.g., Wilson, Dickens & Weber, 978 F.2d at 72. Kaufman's statement was also signed and witnessed by two FBI agents and contained an attestation clause indicating that his statement was "true and accurate." Moreover, Kaufman made his statement to an FBI agent, thus exposing himself to criminal sanctions if he spoke falsely. All these features enhance a hearsay statement's reliability. See Cimino, 964 F.2d at 1312-13. Chiodo similarly made his statement to FBI agents, and Gravano's statement was made under oath on penalty of perjury at a criminal trial.
 
 
 30
 The intercepted statements of Castellano and Avellino also seem likely to have been reliable. Adelstein offered no reason--apart from the "mob lore" theory--to suspect the trustworthiness of the assertion in both intercepted conversations that organized crime controlled Adelstein and the Local. There is no cause to assume that this assertion was in any way a product of faulty memory or perception. Nor is there any indication that either declarant had any motive to lie or brag about what he was saying at the time he said it.
 
 2. Sufficiency of the Evidence
 
 31
 Even assuming that the hearsay was reliable and admissible, Adelstein insists that the evidence as a whole was still insufficient to show that he knowingly associated with Failla. There is no dispute that Adelstein knew Failla was a member of La Cosa Nostra. Rather, the crux of Adelstein's argument is that his contacts with Failla were "done out of necessity to the performance of his job" and that his association more generally was strictly for business purposes.
 
 
 32
 The Consent Decree forbids Union members from "knowingly associating" with members or associates of various organized crime families or any other criminal group. The Decree also defines "knowingly associating" as having "the same meaning as that ascribed to that term in the context of comparable federal proceedings or federal rules and regulations." One such comparable area is the law governing restrictions on the activities of parolees. In that context, we have said that where a parolee is prohibited from "associating with persons having a criminal record," the "term 'associate[ ]' ... [means] something more than merely a fleeting or casual acquaintance." Birzon v. King, 469 F.2d 1241, 1241, 1243 (2d Cir.1972) (footnote omitted); see also Arciniega v. Freeman, 404 U.S. 4, 4, 92 S.Ct. 22, 22, 30 L.Ed.2d 126 (1971) (per curiam) ("[T]he parole condition restricting association was [not] intended to apply to incidental contacts between ex-convicts in the course of work on a legitimate job for a common employer."). A determination of " 'knowing association' should be inferred from the 'duration and quality' of the association." United States v. International Bhd. of Teamsters (Senese & Talerico), 745 F.Supp. 908, 918 (S.D.N.Y.1990), aff'd, 941 F.2d 1292 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).
 
 
 33
 The Administrator found that in "addition to contract-related discussions, Adelstein admitted to being in the company of Failla at social affairs hosted by Failla's trade organization." Adelstein also met or saw Failla at charity affairs and funerals. Although we cannot tell from the record whether or not Adelstein knew he would encounter Failla on these latter occasions, Adelstein doubtless knew that Failla would be present at the affairs hosted by the Trade Waste Association. Adelstein may have had little choice in negotiating with Failla, but surely he could have refused social invitations on behalf of the organization Failla represented. Adelstein claims otherwise, maintaining that he was "required by the nature of [his] job ... [to] attend[ ] social functions with Failla." Insofar as this contention was presented to the district judge, he was justifiably unpersuaded, concluding that Adelstein's relationship with Failla was "beyond that required in [Adelstein's] official capacity." Moreover, the hearsay statements relating to Failla's control of Adelstein lend substantial support to the Administrator's further finding that the ostensibly legitimate business meetings between the two men, which Adelstein says occurred about "once a month," included more than just negotiating contracts and that "Adelstein's links with organized crime [were] widespread and reach[ed] far beyond legitimate Union business." In upholding this finding, the district court described the relationship between Adelstein and Failla as "collaborative, rather than adversarial."
 
 
 34
 Adelstein submits that refusal to do business with Failla would have placed him in breach of his obligation under the IBT Constitution "to faithfully perform all the duties assigned to him to the best of his ability and skill." This argument assumes that Adelstein's business with Failla was all legitimate. The Administrator found that this was not so and that Adelstein's professions of good faith were not credible. The district court could properly find--as it did--that the Administrator's determination was adequately supported by evidence of non-business associations, as well as by evidence that the putative business associations themselves were not wholly legitimate.[2]
 
 
 35
 B. Section 101(a)(5) of the Labor-Management Reporting & Disclosure Act
 
 
 36
 Building on our description of the Investigations Officer and Administrator as surrogates for the Union's ordinary disciplinary mechanism, Adelstein argues that § 101(a)(5) of the Labor-Management Reporting and Disclosure Act, which provides "[s]afeguards against improper disciplinary action" by labor organizations, is fully applicable to proceedings before the Administrator.[3] That being so, he further claims that the proceeding against him violated § 101(a)(5) by denying him a "full and fair hearing." In particular, he argues that he was wrongfully denied the right to cross-examine witnesses, i.e., the hearsay declarants; that there was insufficient evidence to support the charges against him; and that those charges were not "reasonably specific."
 
 
 37
 Although we doubt that § 101(a)(5) affords Union members any greater procedural protections than those which they already enjoy under the terms of the Consent Decree itself, we need not reach that issue. The government points out in its brief that Adelstein never presented any argument based on § 101(a)(5) in the district court, and Adelstein does not maintain otherwise in his reply brief. Ordinarily, we will not address arguments made for the first time on appeal. See, e.g., Morse v. University of Vermont, 973 F.2d 122, 125 (2d Cir.1992); Kraebel v. New York City Dep't of Hous. Preservation & Dev., 959 F.2d 395, 401 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992). We decline to depart from that rule here.
 
 
 38
 We have considered all of Adelstein's claims other than the claim based upon § 101(a)(5), and none justifies reversal.[4] For the foregoing reasons, the order of the district court is affirmed.
 
 JON O. NEWMAN, Chief Judge, dissenting:
 
 39
 When evidence is presented that the head of an employers' trade association is a major figure in organized crime and acted to perpetuate organized crime's influence over a Teamster local through a relationship with the union's negotiator, it is not surprising that adjudicators responsible for administering a consent decree intended to purge the Teamsters of criminal control should impose sanctions against the union's negotiator. But the fact that evidence suffices to permit a result does not necessarily mean that the result has been adjudicated according to legal standards that courts are required to observe. Because I believe that the proceeding resulting in the penalty imposed on appellant Bernard Adelstein was fundamentally unfair, I dissent from the judgment that upholds the penalty.
 
 
 40
 The unfairness, substantial enough to render the administrative decisionmaking arbitrary and capricious, occurred because the basic allegation against Adelstein cannot support a sanction on this record and a significantly different allegation emerged in the course of the adjudicatory process and was ultimately relied on to justify the sanction against him.
 
 
 41
 Adelstein was an officer of IBT Local 813, which represents sanitation workers in the New York City area. Under the IBT consent decree, he was charged by the Investigations Officer with violating the IBT Constitution by conducting himself in a manner to bring reproach upon the IBT and by violating his oath. The sole specification for these two forms of misconduct was precisely set forth in the charging document as follows:
 
 
 42
 TO WIT, while an officer of Local 813, you knowingly associated with members and associates of La Cosa Nostra including James Failla [and Matthew Ianniello and Anthony Corallo].
 
 
 43
 Since the sanction was imposed solely for Adelstein's association with Failla, I confine my consideration to that relationship, as does the Court.
 
 
 44
 It is undisputed that during the relevant times, Failla was the president of the Trade Waste Association, the employers' organization that represents New York's private garbage collection companies, and was the principal negotiator for the Association. It is also undisputed that Adelstein was an officer of Local 813 and the principal negotiator for the Union. Obviously, a union negotiator must "associate" with an employers' negotiator, and the bare fact of an association arising from the negotiating relationship cannot suffice to warrant punishment of the union negotiator. Just as the Supreme Court has recognized that a parolee prohibited from associating with ex-convicts may not be penalized for contacts with ex-convicts working for his employer, see Arciniega v. Freeman, 404 U.S. 4, 92 S.Ct. 22, 30 L.Ed.2d 126 (1971), there can be no doubt that Adelstein cannot be punished simply because he "associated" with the employers' negotiator.
 
 
 45
 The Court does not dispute this basic proposition. Instead, the Court upholds the sanction, as did the Independent Administrator and the District Court, by taking two critical steps, one involving an extension of the facts and a second involving a fundamental change in the charge.
 
 
 46
 First, the Court accepts the "finding" that Adelstein's contacts with Failla were " 'beyond that required in [Adelstein's] official capacity.' " 998 F.2d at 126. The evidence to support such "extra" association is either non-existent or not probative of wrongdoing. The Court notes that Adelstein admitted being in the company of Failla at charity affairs and funerals. A union negotiator is inevitably going to be invited to charity affairs at which the employers' representative is present, and, after years of a negotiating relationship, he cannot be condemned for attending a funeral of a common friend. This is precisely the sort of "fleeting or casual" contact that we have ruled does not constitute an impermissible association. See Birzon v. King, 469 F.2d 1241, 1243 (2d Cir.1972). The Court suggests that Adelstein "could have refused social invitations on behalf of the organization Failla represented." 998 F.2d at 126. Of course he could have, but his failure to do so cannot possibly be evidence of wrongdoing. What union negotiator in his right mind would snub the employer association he must regularly negotiate with by declining to attend the association's social events?
 
 
 47
 The insubstantiality of these indications of an "association" beyond the bounds of legitimate negotiating impels the Court to take the same serious second step taken by the Independent Administrator and the District Court--a change in the fundamental allegation. Where the charge initially alleged only that Adelstein "associated" with Failla, it was transformed to the far more serious allegation that Failla dominated Adelstein to effect control of Local 813 for the benefit of organized crime. The change first occurs in the decision of the Independent Administrator:
 
 
 48
 Given the substantial evidence that Failla and Adelstein worked together to effect control over Local 813 for the benefit of the Gambino Family, I find that the contacts between Adelstein and Failla extended far beyond legitimate Union business and thus, evidence a clear, prohibited association with a member of La Cosa Nostra.
 
 
 49
 Independent Administrator's decision at 14. The association between Adelstein and Failla is actionable not because it exists, as the charge alleges, but because it was used by Failla to exert organized crime's control over the Union.
 
 
 50
 The District Court similarly shifted from an allegation of association to an allegation of corrupt control:
 
 
 51
 The record clearly supports the Independent Administrator's finding that the relationship between Mr. Failla and Mr. Adelstein was collaborative, rather than adversarial, and that this relationship provided the means by which the Gambino Crime Family exerted control over IBT Local 813.
 
 
 52
 998 F.2d at 125. This Court adopts the same approach by noting that the District Court "described the relationship between Adelstein and Failla as 'collaborative, rather than adversarial,' " and by relying on "evidence that the putative business associations themselves were not wholly legitimate." 998 F.2d at 126.
 
 
 53
 I do not doubt that Adelstein could have been charged and perhaps found guilty of violating the Union's constitution by permitting the Union to be dominated by the Gambino Family. But that was not the charge. The allegation was simply that he "associated" with Failla. His contacts with the man he was obliged to negotiate with as the representative of the employers' organization were not shown to be an impermissible "association." He stands condemned for the different offense of selling his union out to organized crime. That is a serious charge, and whether or not he is guilty of it, he is entitled to have it presented in a charging document and to have the entire proceeding focused on it. The decision to punish him on a charge of mere "association" is arbitrary and capricious because it lacks evidentiary support for what was alleged and is ultimately upheld on the basis of what was not alleged.
 
 
 54
 I respectfully dissent.
 
 
 
 [1]
 Adelstein was also the President of IBT Local 1034 and Secretary-Treasurer of the Executive Board of IBT Joint Council 16. Although Adelstein retired from the Union in September 1992, this case is not moot since he could always rejoin the Union
 
 
 [2]
 The dissent argues that the evidence was insufficient to support the charge made against Adelstein and that we have altered the charge to fit the available evidence. This is mistaken. As already noted, the Administrator and the district court found that the evidence against Adelstein supported the view that when Adelstein and Failla met to discuss legitimate Union business, their agenda included more than that. Such "collaborative" meetings, together with the extra-business associations that the dissent deems insubstantial, indicate to us, as they did to the Administrator and the district court, that Adelstein "knowingly associated" with Failla, which is what he was charged with doing
 
 
 [3]
 Section 101(a)(5) provides:
 No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.
 29 U.S.C. § 411(a)(5).
 
 
 [4]
 It is unclear whether Adelstein's vague and passing references in his brief to "constitutional due process" and "freedom of association under the First Amendment" are intended to state claims under the Constitution. If so, they are without merit. See, e.g., Senese & Talerico, 941 F.2d at 1295-97 (Administrator's imposition of sanctions does not constitute government action)