19 F.3d 816
 146 L.R.R.M. (BNA) 2035, 127 Lab.Cas. P 11,051
 UNITED STATES of America, Plaintiff-Appellee,
and
Charles M. Carberry, Esq., Appellee,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA, AFL-CIO, et
al., Defendants,
Nicholas A. DiGirlamo, Appellant.
 No. 714, Docket 93-6194.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 31, 1994.
Decided March 24, 1994.
 
 Irving Achtenberg, Kansas City, MO (Achtenberg & Achtenberg, P.C., of Counsel), for appellant.
 Celia A. Zahner, U.S. Investigations Office, New York City, for appellee.
 Steven C. Bennett, New York City, Asst. U.S. Atty., S.D.N.Y. (Mary Jo White, U.S. Atty. S.D.N.Y., Gabriel W. Gorenstein, Asst. U.S. Atty., of Counsel), for plaintiff-appellee.
 Before: FEINBERG, OAKES and KEARSE, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Nicholas A. DiGirlamo appeals from an order of the United States District Court for the Southern District of New York, David N. Edelstein, J., entered June 24, 1993. The order upheld disciplinary sanctions imposed upon DiGirlamo by the Independent Administrator of the International Brotherhood of Teamsters (IBT). We affirm.
 
 I. Background
 A. The Consent Decree
 
 2
 In 1988, the United States government filed a civil action under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1964, against the IBT, its General Executive Board (Board), the eighteen members of the Board, the Commission of La Cosa Nostra (LCN) and individual members and associates of LCN. See United States v. IBT, 931 F.2d 177, 180 (2d Cir.1991). The government alleged that LCN, through a pattern of racketeering activity, had infiltrated and come to dominate the IBT. The suit sought equitable relief to rid the union of LCN's corrupt influence.
 
 
 3
 In 1989, the government's claims against the IBT, the Board, and the Board members were settled by means of a Consent Decree, which instituted a wholesale reform of the IBT's electoral and disciplinary processes. Id. at 180-81. The Consent Decree prohibits IBT members from "knowingly associating" with members or associates of organized crime groups. The Consent Decree also provides for the appointment of an Investigations Officer to investigate corruption and misconduct within the union and an Independent Administrator (Administrator) whose duties include hearing and deciding union disciplinary charges. The Administrator's decisions in disciplinary cases are subject to review in the district court.
 
 
 4
 B. The Decisions of the Administrator and the District Court
 
 
 5
 In May 1992, the Investigations Officer brought disciplinary charges against DiGirlamo, then a member and employee of IBT Local 41 in Kansas City, Missouri.[1] The charges were that DiGirlamo had knowingly associated with members of LCN including, but not limited to, Peter Joseph Simone, Frank Anthony Tousa, Charles Moretina, and James J. Moretina, and with associates of LCN including, but not limited to, John Anthony Costanza and Nicholas Joseph LaBruzzo. Charles Moretina and James Moretina are DiGirlamo's father-in-law and brother-in-law, respectively. By knowingly associating with these organized crime figures, the Investigations Officer charged, DiGirlamo had brought reproach upon the IBT in violation of his IBT membership oath. Under Sec. 7(b) of the IBT Constitution, violation of the membership oath is grounds for disciplinary action.
 
 
 6
 As required by the Consent Decree, a hearing was held before the Administrator. At the hearing, the case against DiGirlamo was based upon the declaration of FBI Agent Cullen Scott, which incorporated evidence linking DiGirlamo to the four LCN members named above and to other LCN members and associates.
 
 
 7
 In January 1993, the Administrator found that the Investigations Officer proved by a preponderance of the evidence that DiGirlamo had knowingly associated with LCN members Charles Moretina, Peter Simone, James Moretina, and Frank Anthony Tousa. The Administrator rejected the FBI's identification of Costanza and LaBruzzo as LCN members. The Administrator ordered DiGirlamo permanently and immediately barred from the IBT. In June 1993, Judge Edelstein filed an Opinion and Order affirming the Administrator's decision. DiGirlamo appeals from that order.
 
 II. Discussion
 A. Standard of review
 
 8
 This court has not articulated the precise standard to be used by us in reviewing a district court order, which itself reviewed disciplinary action by the Administrator under the Consent Decree. The parties to the Consent Decree expressly adopted an extremely deferential standard of review from decisions of the Administrator. Paragraph 12(A) of the Consent Decree states that the Administrator shall preside at disciplinary hearings "conducted under the rules and procedures generally applicable to labor arbitration hearings" and shall "decide such cases using a 'just cause' standard." In addition, that paragraph states that "[a]ny decision of the Administrator shall be final and binding," subject to the review of the district court. United States v. IBT (Friedman & Hughes), 905 F.2d 610, 616 (2d Cir.1990). The district court is to review decisions of the Administrator under "the same standard of review applicable to review of final federal agency action under the Administrative Procedure Act [APA]."[2] We have held that the effect of these provisions is to require the district court to treat decisions of the Administrator with "great deference." Id. at 616-17. We find that under any reasonable standard of review of the district court's order, it should be sustained.
 
 B. Sufficiency of the evidence
 
 9
 DiGirlamo argues that the Administrator's decision was unsupported by "substantial evidence" as required by the standard of review derived from the APA. "Substantial evidence is more than a mere scintilla." United States v. IBT (Cimino), 964 F.2d 1308, 1311-12 (2d Cir.1992). It is, however, "something less than the weight of the evidence," and the substantial evidence standard may be met despite "the possibility of drawing two inconsistent conclusions from the evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The district court correctly found that the evidence adduced at the hearing met this standard.
 
 
 10
 We hold that the evidence introduced at the hearing supported the Administrator's findings that DiGirlamo knowingly associated with LCN members Charles Moretina, James Moretina, Peter Simone, and Frank Anthony Tousa. We summarize the evidence connecting DiGirlamo to each of the four named LCN members. We emphasize that the summary by no means includes all of the relevant evidence. While certain facts may appear insignificant when viewed in isolation, the body of evidence as a whole clearly establishes a long-term pattern of association with LCN.
 
 1. James Moretina
 
 11
 Confidential sources have identified James Moretina as an LCN member. In 1992, he pleaded guilty to money laundering in connection with an illegal gambling business.
 
 
 12
 With James Moretina's help, DiGirlamo found a job on the loading dock of a freight company when he joined the IBT in 1978 or 1979. In 1980, DiGirlamo obtained James Moretina's assistance in getting a job as accountant for IBT Local 41 in Kansas City.
 
 
 13
 In 1985, DiGirlamo was fired from Local 41. James Moretina, who was president of the "Be Amused" vending machine company, hired DiGirlamo to do bookkeeping work for the company. DiGirlamo continued to do bookkeeping for Be Amused even after returning to his job at Local 41 in 1987. In 1990, the FBI confiscated illegal video poker machines from Be Amused and seized the company's books. In 1991, DiGirlamo testified about the company before a grand jury. In July 1991, James Moretina and Simone were arrested for laundering illegal gambling money through Be Amused. Despite these developments, DiGirlamo continued to work for the company until as late as March 1992.
 
 
 14
 DiGirlamo admitted that James Moretina often telephoned him at Local 41 and the two had a "comfortable amount" of telephone conversation. In a telephone call recorded in 1990, DiGirlamo and James Moretina discussed how to get a dentist on a list for referrals from Local 41. In a separate conversation, the men discussed rivalries within the union in relation to an upcoming union election.
 
 2. Charles Moretina
 
 15
 DiGirlamo concedes Charles Moretina's underworld ties. In 1980, Harvey Bonadonna, participant in the Federal Witness Protection Program and son of a deceased LCN member, identified Charles Moretina as an LCN member and "killer or murderer for the [Carl] 'Tuffy' DeLuna group." Newspaper articles introduced at DiGirlamo's hearing also linked Moretina to organized crime. In 1981, Moretina was indicted, along with Kansas City LCN underboss Carl Civella and other defendants, in connection with a conspiracy to skim proceeds from a Las Vegas casino. United States v. DeLuna, 763 F.2d 897, 904 (8th Cir.), cert. denied sub nom. Thomas v. United States, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). Moretina was eventually convicted on charges of conspiracy and interstate transportation of stolen property. Id.
 
 
 16
 Before Charles Moretina's conviction in 1983, DiGirlamo saw him "[o]ne, two times, maybe more" each month. In 1982 or 1983, John Couts, an officer of Local 41, accused DiGirlamo of "putting the make" on his daughter and fired him. DiGirlamo told Moretina about the incident. When DiGirlamo later encountered Couts, Couts cried, asked for forgiveness, and rehired him.
 
 
 17
 In 1983, DiGirlamo attended Charles Moretina's trial. During the trial, DiGirlamo's car, and a car belonging to a union organizer, Tom Nabors, were observed parked outside Moretina's home during business hours. After Moretina's conviction, DiGirlamo remained in contact with him. DiGirlamo traveled to Milan, Michigan twice to visit Moretina in prison and has spoken to him on the phone several times.
 
 3. Peter Simone
 
 18
 Confidential sources have identified Peter Simone as a "made" member of LCN. Harvey Bonadonna identified Simone as an LCN member in charge of illegal casinos in Kansas City. Newspaper reports introduced at DiGirlamo's hearing identified Simone as an LCN "underboss." Simone was convicted on gambling conspiracy charges in 1976 and on charges of operating an illegal casino in 1992. In 1988, the Senate Permanent Subcommittee on Investigations found Simone to be a "capo" (a supervisor or "street boss") of LCN.
 
 
 19
 In 1975, prior to joining the IBT, DiGirlamo was indicted, along with Simone, Tousa, and several LCN associates, on charges of operating a gambling business. DiGirlamo eventually pleaded guilty to one count of conspiracy to operate a gambling game in 1977. Although he was aware that his co-conspirators were allegedly involved in organized crime, he continued to associate with them.
 
 
 20
 DiGirlamo and Simone have known each other since they attended grade school together. After their convictions on the gambling charges, they played together in sports leagues. James Moretina sometimes asked DiGirlamo to pick up the Be Amused books at a Kansas City social club owned by Simone. Simone would sometimes call DiGirlamo at Local 41 to tell him to pick up the books. DiGirlamo admitted that he had heard the club described as a "casino" and that he saw people playing cards there. Simone later pleaded guilty to operating an illegal casino at the club.
 
 4. Frank Anthony Tousa
 
 21
 Based on its organized crime investigations, the FBI considers Frank Anthony Tousa to be a member of LCN. In 1976, Tousa was convicted of conspiracy to operate an illegal gambling business. In 1980, Harvey Bonadonna described Tousa as the Kansas City LCN's "Las Vegas connection" in charge of football betting. Newspaper accounts introduced at DiGirlamo's hearing linked Tousa to LCN. DiGirlamo testified that he had been to Tousa's home in 1986 or 1987 and that he had prepared a tax return for Tousa and his wife in 1985 or 1986.
 
 
 22
 In light of the foregoing, it is indisputable that substantial evidence supported the Administrator's finding that DiGirlamo had "extensive involvement" with the Moretinas, Simone, and Tousa. In view of substantial newspaper coverage, as well as DiGirlamo's regular contact with the four men over many years, the Administrator was justified in inferring that DiGirlamo must have known of their ties to organized crime. Cf. United States v. IBT (Cozza), 764 F.Supp. 797, 801-02 (S.D.N.Y.1991), aff'd, 956 F.2d 1161 (2d Cir.1992).C. Prohibited Association
 
 
 23
 DiGirlamo insists, however, that his associations with these LCN members constituted only "innocent familial or professional associations" and were not prohibited by the Consent Decree. DiGirlamo contends that the Consent Decree prohibits only association for improper purposes. We disagree.
 
 
 24
 An association with an LCN member "beyond that required in [one's] official capacity" may constitute knowing association. United States v. IBT (Adelstein), 998 F.2d 120, 126 (2d Cir.1993). Under the Consent Decree, "knowingly associating" has "the same meaning as that ascribed to that term in comparable federal proceedings or federal rules and regulations." We have held that one such comparable area of law is that governing restrictions on parolees' activities. Id. at 125. While restrictions on parolees' association with persons having criminal records do not prohibit "a fleeting or casual acquaintance," Birzon v. King, 469 F.2d 1241, 1243 (2d Cir.1972), the restrictions are not limited only to associations that involve improper activity. Such restrictions are violated by a "calculated choice" to associate with persons having a criminal record. United States v. Albanese, 554 F.2d 543, 546 & n. 6 (2d Cir.1977).
 
 
 25
 DiGirlamo's contacts with LCN members clearly constituted conscious choices. The fact that DiGirlamo was married to Charles Moretina's daughter might constitute an innocent familial explanation for some of his contacts with the Moretinas: for example, DiGirlamo's trips, with his wife and children, to visit her father in prison. But even if family ties can excuse association with organized crime figures, family ties do not fully explain DiGirlamo's relationship with the Moretinas. DiGirlamo often spoke with the Moretinas about union-related matters. For example, he discussed a union election and dentist referrals by the union with James Moretina and discussed his dismissal by Couts with Charles Moretina. DiGirlamo once went unaccompanied by his wife to visit Charles Moretina in the federal penitentiary in Michigan.
 
 
 26
 Furthermore, family ties cannot in this context justify DiGirlamo's contacts with Tousa and Simone or his bookkeeping work for James Moretina's Be Amused company. DiGirlamo calls these ties "innocent" professional associations. In the parole context, it has been held that restrictions on association allow "incidental contacts ... in the course of work on a legitimate job for a common employer." Arciniega v. Freeman, 404 U.S. 4, 4, 92 S.Ct. 22, 22, 30 L.Ed.2d 126 (per curiam) (1971). But DiGirlamo's "professional" associations were much more significant. He did bookkeeping for a business run by James Moretina--a business that was involved in illegal gambling operations. He picked up the books for this job at Simone's illegal gambling club. He also prepared tax returns for Tousa. In addition to his non-union business contacts with Tousa and Simone, DiGirlamo had social contact with them as well.
 
 
 27
 The above is sufficient to demonstrate that DiGirlamo engaged in prohibited association, even if the association was not for an improper purpose. Without relying on other evidence for our decision, however, it should be noted, for purposes of portraying a complete picture, that some evidence further suggested that DiGirlamo not only associated with organized crime figures, but that he may also have served as an instrument of LCN influence on Local 41. As noted above, it was James Moretina who assisted DiGirlamo in joining the union and becoming its bookkeeper in 1980. A confidential informant stated that LCN member Carl Civella, who controlled hiring at Local 41, was "instrumental" in the hiring of DiGirlamo. In 1981 and 1982, James Moretina, Civella's girlfriend Rita Armilio, and LCN member Carl DeLuna's stepson Rick DeLuna were hired to work at Local 41. DiGirlamo's firing in 1985 coincided with the firings of James Moretina, Armilio and DeLuna. FBI Agent Scott attributed the purge to a "bad relationship" between the Civella organization and Local 41 president John Couts. A few months after Couts's death in 1987, Dan Johnson, Local 41's new president, rehired DiGirlamo. In 1990, a confidential FBI informant stated that LCN used DiGirlamo to keep apprised of Local 41's financial status so that Johnson could not cite lack of funds as grounds for refusing to follow LCN orders.D. LMRDA provisions
 
 
 28
 DiGirlamo argues that, as applied to his case, both the IBT constitution and the Investigations Officer's disciplinary charges against him violate the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. Sec. 401 et seq. Under the LMRDA, a labor organization is prohibited from disciplining one of its members unless the member has been "(A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C. Sec. 411(a)(5).
 
 
 29
 DiGirlamo argues that the charge against him, as well as the provision of the IBT constitution prohibiting "knowing association," lacked the specificity required by the LMRDA.[3] He further argues that both the prohibition on knowing association and the prohibition on bringing "reproach" upon the union are impermissibly vague as applied to his conduct. He claims that the language of the provisions is insufficient to put a reasonably intelligent union member on notice that associations such as DiGirlamo's would result in disciplinary action. We agree with the district court that these arguments are without merit.
 
 
 30
 The LMRDA does not require of disciplinary charges the level of specificity required in criminal prosecutions. Berg v. Watson, 417 F.Supp. 806, 810 (S.D.N.Y.1976). Furthermore, we have held that IBT members were aware that association with organized crime figures was prohibited even before the Consent Decree added the provision to the union constitution. United States v. IBT (Senese & Talerico), 941 F.2d 1292, 1297 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). The new provision "simply made explicit the longstanding goal of the IBT to be free of corruption." Id. Even assuming the existence of hypothetical situations in which the prohibitions would be considered vague, however, DiGirlamo's is not such a case. We have held that "it should have been clear to [union members disciplined for associating with LCN] that associating with known members of organized crime would bring reproach upon the IBT...." Id. at 1298.
 
 
 31
 DiGirlamo also argues that he was denied a reasonable amount of time to prepare his defense at the disciplinary hearing before the Administrator. Specifically, he alleges that his counsel first gained access to hundreds of pages of evidence to be used against him only days before the hearing. Although DiGirlamo had unsuccessfully moved for a bill of particulars before the hearing, he did not raise the argument of insufficient time to prepare at the hearing; nor did he move for adjournment or continuation of the hearing in order to prepare further. Finally, the Administrator offered DiGirlamo the usual opportunity to file post-hearing submissions.
 
 
 32
 DiGirlamo further argues that the sanctions against him violate the guarantee of free speech and association of Sec. 101(a)(2) of the LMRDA (codified at 29 U.S.C. Sec. 411(a)(2)). This argument is entirely meritless. "The IBT's sanctioning members in order to rid itself of corrupt influence conforms with Sec. 101(a)(2) of the LMRDA, and infringes no First Amendment rights." Senese & Talerico, 745 F.Supp. 908, 913 (S.D.N.Y.1990), aff'd, 941 F.2d 1292 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).
 
 E. Hearsay
 
 33
 DiGirlamo also takes issue with the admission of hearsay evidence at his hearing. In IBT disciplinary proceedings, as in administrative proceedings, evidentiary rules are relaxed. Adelstein, 998 F.2d at 124. Thus hearsay is admissible, provided it is reliable. Id. Hearsay statements may gain reliability by corroborating one another or by including specific details. Id. at 124-25.
 
 
 34
 DiGirlamo contends, however, that the hearsay admitted against him at the disciplinary hearing was unreliable. We disagree. Contrary to DiGirlamo's assertions, the declaration of FBI Agent Cullen Scott was not hearsay because DiGirlamo's counsel was able to cross-examine Agent Scott at the hearing. DiGirlamo maintains that the newspaper articles and Senate Reports attached as exhibits to the declaration were also unreliable hearsay. As the district court found, however, the hearsay statements admitted at the hearing corroborated each other or were corroborated by reliable independent sources.
 
 
 35
 We have considered all of appellant's arguments and find them to be without merit. The order of the district court is affirmed.
 
 
 
 [1]
 The charge against DiGirlamo read as follows:
 While a member and employee of IBT Local 41, you brought reproach upon the IBT and violated your membership oath in violation of Article II, Section 2(a) and Article XIX, Section 7(b)(1) and (2) of the IBT Constitution, to wit:
 From 1978 to the present, while a member and employee of IBT Local 41, you knowingly associated with members of La Cosa Nostra ("LCN"), including, but not limited to, Charles Moretina, James J. Moretina, Peter Joseph Simone, and Frank Anthony Tousa. From 1978 to the present, you also knowingly associated with associates of LCN including, but not limited to, John Anthony Costanza and Nicholas Joseph LaBruzzo.
 
 
 [2]
 That standard of review requires a reviewing court to hold unlawful and set aside agency action, findings and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence ...; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 * * *
 5 U.S.C. Sec. 706.
 
 
 [3]
 The district court addressed these arguments despite its finding that DiGirlamo had failed to properly raise them before either the district court or the Administrator. DiGirlamo has failed to show otherwise. Nonetheless, since the district court did deal with these arguments, and because they raise serious issues, we address them here