**UNITED STATES of America**
**Plaintiffs,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al.,**
**Defendants.**

**Independent Review Board Application 90 (Thomas R. O'Donnell)**

**No. 88 CIV. 4486(LAP).**

United States District Court, S.D. New York.

April 3, 2001.

### MEMORANDUM and ORDER

PRESKA, District Judge.

This opinion emanates from the voluntary settlement of an action commenced by the United States of America against, inter alia, the International Brotherhood of Teamsters ("IBT" or "union") and the IBT's General Executive Board. The settlement is embodied in the voluntary consent decree order entered March 14, 1989 ("Consent Decree"). The goals of the Consent Decree are to rid the IBT of the hideous influence of organized crime and establish a culture of democracy within the union. The long history of this case has been set forth in the Court's numerous prior opinions. Accordingly, only those facts necessary for resolving the instant matter shall be set forth.

Currently before the Court is Application 90 of the Independent Review Board ("IRB") ("Application 90"), dated November 14, 2000. In Application 90, the IRB requests that the Court affirm the IRB's November 13, 2000 Opinion and Decision ("IRB Decision"). For the reasons set forth below, I grant IRB Application 90 and affirm the IRB Decision in all respects.

### Background

During the 1996 IBT election, the campaign of James P. Hoffa requested that Thomas O'Donnell ("O'Donnell"), then candidate for IBT Vice President–at–Large and currently Local Union 817 President and IBT Vice President–at–Large, hire Kevin Currie ("Mr. Currie") as Campaign Coordinator. *See* IRB Decision at 2. In an interview with Mr. Currie in May 1996, O'Donnell asked whether Mr. Currie had a criminal record. *See id.* Although he had been convicted of grand larceny in the State of New York, Mr. Currie answered that he did not have a criminal record, and O'Donnell hired him as Campaign Coordinator with a salary of $700 per week. *See id.* Shortly thereafter, O'Donnell learned of Currie's criminal record, became upset, and began thinking of ways to punish Mr. Currie. *See id.* at 3. For the purpose of offending Mr. Currie, O'Donnell decided and informed Mr. Currie that he would pay Mr. Currie's salary to Currie's wife, Marianne Currie ("Mrs. Currie"). *See id.*

From May 1996 through October 1996, O'Donnell's campaign wrote eleven checks to Mrs. Currie, signed by O'Donnell, totaling $12,684.75, reflecting Mr. Currie's salary as Campaign Coordinator, less taxes, which were withheld in Mrs. Currie's name. *See id.* at 3–4. In November 1996, O'Donnell fired Mr. Currie and stopped paying his salary. *See id.* at 4. Mr. Currie was then hired by Hoffa's campaign, with a similar payment arrangement to Mrs. Currie. *See id.*

Under the Rules for the 1995–1996 IBT International Union Delegate and Officer Election ("IBT Election Rules"), every candidate was required to file periodic Campaign Contribution and Expenditure Reports ("CCERs" or "Reports" or "forms") detailing each contribution and expenditure over $100. O'Donnell signed and certified as true five such CCERs listing "Mary Ann Currie" as the "payee" of the salary that was due to Mr. Currie on account of his services. Next to Mrs. Currie's name, the purpose of the expenditure was described as "salary/campaign coordi-

nator." *See* IRB Investigative Report, Exs. 1,6,8,10,12. Each of these CCERs listed Mr. Currie separately, on the same page, as the "payee" of various other expenditures, for the stated "purpose" of "misc supplies" and "campaign materials." *See id.* The CCERs were prepared at O'Donnell's request by Matthew Dapolito, who served as the CPA for Local Union 817 and for O'Donnell's campaign, based on information provided him by O'Donnell or the staff secretary of Local Union 817, Kathleen Kreinbihl. O'Donnell reviewed, signed and submitted the CCERs. *See* IRB Decision at 5-6.

On December 3, 1998, the IRB issued an Investigative Report and forwarded it to Tom Sever, then Acting General President of the IBT, recommending charges against O'Donnell for bringing reproach upon the IBT in violation of Article II, Section 2(a) of the IBT Constitution by filing CCERs in which he failed to disclose the payments to Mr. Currie. *See* IRB Hearing Transcript, Ex. 1, at 1. Sever filed the proposed charges and, after taking office on March 19, 1999, C. Thomas Keegel, General Secretary–Treasurer of the IBT ("Keegel"), referred the charges to Joint Council 16 ("Joint Council") for resolution. *See* IRB Hearing Transcript, Ex. 4.

On May 20, 1999, a panel appointed by the Joint Council held a hearing on the matter and on October 20, 1999, the panel issued a Report and Recommendation. *See* IRB Hearing Transcript, Ex. 10. The Joint Council found that O'Donnell violated Article II, Section 2(a) of the IBT Constitution when he intentionally filed CCERs that failed to disclose payments to Mr. Currie for his services, but that O'Donnell did not intend to deceive the Election Officer. *See id.* at 9. The Joint Council recommended that O'Donnell forfeit thirty days salary from the IBT and cease providing services as an officer of the IBT for this

period. *See id.* On November 1, 1999, having reviewed the Joint Council's Report and Recommendation, Keegel issued a decision finding that O'Donnell had violated his obligation to file accurate and complete CCERs and thereby had violated Article II, Section 2(a) of the IBT Constitution, and directing O'Donnell to pay a fine of $6,500. *See id.* at 3-4.

Upon review of Keegel's decision, the IRB informed Keegel, through John J. Cronin, Jr., Administrator of the IRB, in a letter dated January 4, 2000, that it found the IBT's finding and sanction inadequate and returned the matter to the IBT for reconsideration. *See* IRB Hearing Transcript, Ex. 12 at 1. Specifically, the IRB stated that the conclusion that O'Donnell had acted without intent to deceive the Election Officer was contrary to the facts and that, regardless of his motive, O'Donnell had intentionally signed and submitted false CCERs. *See id.* Accordingly, Keegel reviewed and reexamined the record and his findings and conclusions, and by letter dated January 21, 2000, Keegel informed the IRB that he would not disturb the original decision. *See* IRB Hearing Transcript, Ex. 13 at 1. Additionally, Keegel stated his finding that O'Donnell believed the CCERs were accurate and thus he did not intentionally fail to disclose payments to Mr. Currie for services rendered to the campaign. *See id.* at 4. The IRB again found Keegel's decision inadequate and by letter dated February 3, 1999, the IRB informed Keegel and O'Donnell that it had scheduled a *de novo* hearing to consider the charges against O'Donnell. *See* IRB Hearing Transcript, Ex. 14.

On May 22, 2000, the scheduled hearing was held before the IRB. The IRB issued its Decision on November 13, 2000, finding that, as detailed in the Decision, O'Donnell brought reproach upon the IBT and violated the IBT Constitution by filing CCERs

that he knew improperly failed to disclose payments to Mr. Currie for services rendered to the campaign. *See* IRB Decision at 14. As a penalty, the IRB imposed on O'Donnell a nine-month suspension during which he may not obtain employment, consulting or other work, from any IBT or IBT-affiliated entity or participate in any affairs of the IBT or Local Union 817 as an officer or employee, but during which he may maintain his membership in the IBT. *See id.* The IRB submitted Application 90 on November 14, 2000 for a ruling of the Court on the IRB Decision. The parties filed papers responding to the IRB Application.

## Discussion

### I. Standard of Review

■ The Court reviews determinations made by the IRB under an "extremely deferential standard of review." *United States v. International Bhd. of Teamsters ("Simpson")*, 120 F.3d 341, 346 (2d Cir. 1997) (quoting *United States v. International Bhd. of Teamsters ("DiGirlamo")*, 19 F.3d 816, 819–20 (2d Cir.), *cert. denied*, 513 U.S. 873, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994)). Specifically, under both the Consent Decree and the Rules and Procedures for the Operation of the Independent Review Board ("IRB Rules"), "[i]n reviewing actions of the IRB, this Court shall apply the same standard of review applicable to review of final federal agency action under the Administrative Procedure Act." IRB Rules, ¶ O; Consent Decree, Art. K (same). *See United States v. International Bhd. of Teamsters ("Giacumbo")*, 170 F.3d 136, 141 (2d Cir.1999).

Therefore, as the Court of Appeals has directed, the Court reviews the IRB's findings of fact for " 'substantial evidence' on the whole record." *Id.* at 143. Substantial evidence "is more than a mere scintilla [and] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted). Therefore, for example, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the IRB's] finding from being supported by substantial evidence." *Id.* (quoting *Illinois Cent. R.R. v. Norfolk & W. Ry.*, 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966)) (internal citations omitted).

Moreover, "[a]ssuming that the [IRB's] findings of fact are supported by substantial evidence, inferences based on those findings are discretionary and can only be disturbed if they are arbitrary and capricious. When reviewing inferences, [the Court is] obliged to guard against [the IRB] drawing inferences that are arbitrary in relation to the facts found, no matter how substantial may be the support of those facts." *Id.* (quotations and alterations omitted).

With respect to the Court's review of sanctions imposed by the IRB, the Court's inquiry is "limited to whether the [IRB] made an allowable judgment in [its choice] of the remedy." *Id.* (internal quotations omitted). Thus, the Court may set aside the IRB's choice of sanctions only "where the sanctions are 'unwarranted in law' or 'without justification in fact.' " *Id.* (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 186, 188, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973)). Indeed, as the Second Circuit has emphasized, "[t]he choice of appropriate sanctions ... [is] peculiarly within the purview of the IRB." *Id.* at 144.

### II. Objections to the IRB Application

In urging the Court to reject IRB Application 90, O'Donnell, through counsel, and the IBT have raised several arguments. First, in his initial objections to the IRB Application, O'Donnell argues that, in signing and certifying as true the CCERs,

O'Donnell reasonably relied on the professional advice of his accountant, Dapolito, and therefore O'Donnell did not possess the intent necessary for a finding that he brought reproach upon the IBT. Second, O'Donnell contends that the CCERs "were in fact filled out accurately in accordance with the instructions provided." Written Objections to Amended Application No. 90 of the Independent Review Board in the Matter of Thomas R. O'Donnell ("O'Donnell Objections"), at 13. Third, O'Donnell claims that the sanction imposed by the IRB is "grossly excessive" because of the monetary consequences it entails. *Id.* at 3.

In his response papers, O'Donnell argues additionally that the Chief Investigator of the IRB acted in an "arbitrary and capricious fashion" in choosing to bring charges against O'Donnell but not against Hoffa, who they allege engaged in the same conduct as O'Donnell. *See* Memorandum in Response to Application No.

90 of the Independent Review Board in the Matter of Thomas R. O'Donnell ("O'Donnell Response"), at 4. Finally, in his response papers O'Donnell also offers the apparent concession that he "remains responsible for whether the CCER is objectively correct," but he argues that his reliance on his accountant defeats "the intentional misconduct standard that should be necessary to bring reproach upon the [IBT]." *Id.* at 7.

The IBT's objections to the IRB Application focus on the sanction imposed. The IBT contends that the IRB failed to explain why it found inadequate the penalty imposed by the IBT on O'Donnell and that the penalty imposed by the IRB is inappropriate because it is not proportionate to the nature of O'Donnell's violation. *See* Letter from Patrick J. Szymanski, IBT General Counsel, to the Honorable Loretta A. Preska, dated Dec. 12, 2000 ("IBT Letter"), at 4.[1]

---

1. Additionally, the IBT requests clarification of the terms of O'Donnell's suspension as it relates to whether and to what extent he may participate in the IBT 2001 election cycle. *See id.* at 5–6.

    On January 3, 2001, I issued an Order requiring any such request for clarification be addressed to the IRB by fax no later than January 5, 2001. Pursuant to the Order, on January 5, 2001, the IBT sent a fax to the IRB requesting clarification as to:

    whether the penalty imposed in anyway [sic] prevents Mr. O'Donnell (a) from becoming a candidate for delegate from Local 817, (b) from being elected and serving as a delegate, (c) from attending the [IBT] Convention either as a delegate or in any capacity other than as an officer for the [IBT] or Local 817, (d) from being nominated for [IBT] Office at the Convention, or (e) from engaging in campaign and election-related activities (for delegate and [IBT] office) during his suspension.

    On January 16, 2001, the IRB responded that a determination of O'Donnell's eligibility to run for office during the term of his suspension depends on the IBT's interpretation and application of relevant provisions of the

IBT Constitution. In addition, the IRB brought the question of O'Donnell's eligibility to run for office under the 2000–2001 IBT Election Rules to the attention of the Election Administrator.

On January 19, 2001, the Election Administrator responded that: (1) "the IRB suspension should not preclude O'Donnell from becoming a candidate for delegate or from being elected and serving as one"; (2) "[i]f he is elected as a delegate, he could attend the convention as such provided he is otherwise eligible, [and i]f he is not, he could attend the convention as a member with any rights his membership would provide"; (3) "[h]e would not be precluded from holding [international] office if elected ... if his suspension ends on 13 August 2001 ... because his term would not begin until after that date" and therefore there is "no reason at this point why the IRB's suspension would adversely affect O'Donnell's ability to be nominated for International Union office at the convention"; and (4) "[t]he IRB suspension would not prevent O'Donnell from engaging in campaign or election-related activities for delegate or International Union office during his suspension."

III. Analysis

At the outset, I uphold the IRB's finding of fact that "O'Donnell filed a [CCER] that he knew to be wrong." IRB Decision at 8. There is no merit to O'Donnell's argument that the "CCER forms were in fact filled out accurately in accordance with the instructions provided," O'Donnell Objections at 13, or to his more curious claim that, although Keegel and the Joint Council found that the CCERs were "objectively incorrect" and not "true, correct and complete," they did not find that the CCERs were "false." O'Donnell Response at 7. O'Donnell contends that the CCERs were not false because they accurately reflected that Mrs. Currie was the payee of the expenditures and that the expenditures were made for the stated purpose of "salary/campaign coordinator," even though the payments were in fact for the work performed by Mr. Currie, and not Mrs. Currie, as Campaign Coordinator. Such a reading of the CCERs is patently untenable. At best, as the IRB found, "[w]hile the description on the CCERs may have been accurate as to the exact identity of the payee of the checks, it does not accurately reflect the underlying transaction." IRB Decision at 8.

The only reasonable way to read the CCERs is to examine each form as a whole and to draw reasonable inferences from the information provided. Taken together, the entries listing Mrs. Currie's name next to the phrase "salary/campaign coordinator" and the amount expended for that salary clearly describe Mrs. Currie as the payee of the salary for work she supposedly performed as Campaign Coordinator. Moreover, on the same page as the entries for Mrs. Currie, each form contains a separate entry for Mr. Currie, next to entries listing the purpose of the expenditure as "misc supplies" or "campaign materials" as well as an amount expended separate from

Mr. Currie's salary. It would require a most twisted reading of this form to divine that the phrase "salary/campaign coordinator," although listed next to Mrs. Currie's name, actually refers to work performed by Mr. Currie, who is listed separately on the same form without any hint that he performed the work.

Before filing each CCER, O'Donnell signed a verification stating in part that "I declare that this Report of Campaign receipts, expenditures, debts and fund balances . . . has been examined by me and to the best of my knowledge and belief is a true, correct and complete Report . . . as required by [the IBT Election Rules] . . . ." Thus, as the IRB properly determined, when he signed and filed the CCERs despite knowing that, contrary to the clear terms of the verification, the forms were not "true, correct and complete," O'Donnell engaged in a "knowing violation" of the IBT Election Rules. IRB Decision at 13. Indeed, in light of the express language of the verification, O'Donnell's purported defense, relying on the findings of Keegel and the Joint Council that the CCERs were "objectively incorrect" and not "true, correct and complete," appears instead to amount to a concession of O'Donnell's direct violation of the requirements of the verification and the IBT Election Rules.

Having upheld the IRB's finding that O'Donnell violated the IBT Election Rules by signing and filing CCERs that he knew were wrong, I will now address O'Donnell's claim that when he signed the CCERs, he reasonably relied on the advice of his accountant, Dapolito. *See* O'Donnell Objections at 9–12. Before considering the merits of this claim, however, I first note that the precise nature of the claim is not entirely clear. In his response papers, O'Donnell refers to "a legal question as to whether it was reasonable to Mr. O'Don-

nell to rely upon the advice of his accountants and whether those accountants were providing an accounting service." O'Donnell Response at 5. O'Donnell asserts that he "should be entitled to rely on [Dapolito's] professional decision" regarding the completion of the CCERs. *Id.* at 6.

At the same time, however, O'Donnell states his insistence that "Mr. O'Donnell remains responsible for whether the CCER is objectively correct . . . ." *Id.* at 7. Finally, in apparent refinement and limitation of his argument, O'Donnell asserts that "[r]eliance on the accountant is used to defeat the intentional misconduct standard that should be necessary to bring reproach upon the [IBT]." *Id.* It seems, then, that rather than attempting to rely on Dapolito's professional advice to relieve him of responsibility or culpability for the substance of the CCERs, O'Donnell instead focuses on the question of whether the IRB properly found that O'Donnell's conduct brought reproach upon the IBT. The argument is thus limited to O'Donnell's initial objection that "reliance on the advice of a professional such as counsel or an accountant can negate the intent necessary to a finding that an individual has brought reproach upon the [IBT]." O'Donnell Objections at 9. In support of this line of reasoning, O'Donnell refers to the IRB's finding of "no intentional concealment" on O'Donnell's part. *Id.* at 15 (quoting IRB Decision at 9). Upon consideration of O'Donnell's arguments, I find his analysis unconvincing and his reference to the IRB finding misplaced.

■ O'Donnell's argument is premised on the supposed existence of legal standards such as a "level of intentional conduct necessary to bring reproach upon the IBT," O'Donnell Objections at 15 (quotations omitted), and "the intentional misconduct standard that should be necessary to bring reproach upon the [IBT]." O'Donnell

Response at 7. O'Donnell offers no case law that supports the existence of such standards. O'Donnell does cite one case involving misconduct by an IBT member in which Judge Edelstein stated that "[r]easonable reliance on the advice of counsel can negate intent and, therefore, can exculpate a charged individual." *United States v. IBT ("Caldwell")*, 831 F.Supp. 278, 284 (S.D.N.Y.1993). O'Donnell's selective quotation from Judge Edelstein's opinion is unavailing. When read in context of the case as a whole, Judge Edelstein's opinion only provides further grounds on which to reject O'Donnell's arguments.

In considering the reliance defense in *Caldwell*, Judge Edelstein began his analysis with the acknowledgment that, because the charges involved "fraudulent intent" to deprive the union of its funds, demonstration that the charged individuals lacked intent to commit any wrongdoing—because they reasonably relied on the advice of counsel—could have negated a necessary element of the charge. *Id.* Thus, Judge Edelstein did not invoke any heightened level of intent necessary for a finding that an individual brought reproach upon the IBT. He merely noted the unremarkable principle that when intent is an element of an offense, the charges against an individual cannot be sustained absent the requisite intent to commit the charged offense. Applied to O'Donnell, this case simply provides O'Donnell with a potential defense if he can demonstrate that reasonable reliance on the advice of counsel negated his intent to file a claim that he knew was wrong. Any such defense fails on a number of grounds.

As Judge Edelstein continued, "[i]t is axiomatic that reliance on the advice of counsel does not negate the element of intent unless such reliance is reasonable." *Id.* at 285 (quotations and citations omit-

ted). In *Caldwell*, Judge Edelstein found that because

> the Bylaws and IBT constitutional provisions reviewed by [counsel] are facially explicit and susceptible to interpretation by laymen ... and because Respondents had been put on notice [that their actions] might violate these provisions, Respondents' alleged blind reliance on [counsel] was unreasonable [and][t]hus, ... such unreasonable reliance would not negate the element of intent.

*Id.* Likewise, the CCER instructions reviewed by Dapolito are clear on their face and do not require interpretation by an accounting professional, and the verification placed O'Donnell on clear notice that signing a Report that was not "true, accurate and complete" would violate the IBT Election Rules.

> Therefore, the IRB properly found that Dapolito did nothing which could have not been performed by a person skilled in office procedure. The compilation of bits of information by Dapolito without any inquiry into or examination of the facts, did nothing to free O'Donnell from his obligation to personally review what had been prepared for his signature and provide a "true, correct, and complete" Report [,]

IRB Decision at 12, and that "[b]ecause the CPA was compiling simple data that virtually anyone with minimal office skills could have done, the fact that the Reports were prepared by a CPA did not in any way lessen O'Donnell's obligations under the foregoing oath." *Id.* at 13.

█ Alternatively, and more fundamentally, O'Donnell's case differs from *Caldwell* with respect to the nature of the charges and the defense asserted. In *Caldwell*, Judge Edelstein recognized that the charged individuals stated an accurate legal principle in claiming that, if reliance on counsel negated their intent to defraud,

by definition they could not be found to have committed "fraudulent intent." *Caldwell*, 831 F.Supp. at 284. By contrast, O'Donnell cannot argue that based on Dapolito's advice, he lacked the requisite intent to sign a CCER that he knew to be wrong. Dapolito's advice negates neither O'Donnell's intent to sign the form nor O'Donnell's knowledge of the clear substance of the form he intentionally signed.

Therefore, O'Donnell instead asserts a different defense, no more successful, based on the purported "level" of "intentional misconduct" necessary for the IRB's finding that he brought reproach upon the IBT. As noted above, contrary to O'Donnell's claim, Judge Edelstein's opinion in *Caldwell* does not refer to any such heightened standard of "intentional misconduct." Moreover, to the extent that such a standard might be applicable here, the IRB properly found that O'Donnell engaged in intentional misconduct, including "fil[ing] a Report that he knew to be wrong." IRB Decision at 8. Consequently, even under a heightened standard of intentional misconduct, the IRB properly concluded that O'Donnell "brought reproach upon the IBT and violated the IBT Constitution by filing [CCERs] with the Election Officer which he knew to be wrong." *Id.* at 14.

Nevertheless, O'Donnell persists in his argument that his actions lacked the requisite intent. Surprisingly, O'Donnell attempts to buttress this argument through a reference to the IRB Decision. O'Donnell cites the IRB's finding of "no intentional concealment" on O'Donnell's part in filling out the CCERs. IRB Decision at 9. Again, however, O'Donnell reads a statement out of context to distort its meaning to his own advantage. The phrase O'Donnell cites from the IRB Decision refers specifically to the IRB's finding that "O'Donnell did not intend to conceal the role of Kevin Currie in his Campaign."

*Id.* This finding is fully consistent with the IRB's clear and correct finding of an intent to file a CCER he knew was wrong. Therefore, although the IRB acknowledged that O'Donnell's case was "unique" and atypical, in that "intent to conceal" was not "inferred form the false filing," *id.*, by the same token, the lack of intent to conceal need not and did not detract from its finding of an intentionally false filing.

O'Donnell's lack of intent to conceal Mr. Currie's role in the campaign is relevant, however, to the final stage of my analysis, review of the sanction imposed by the IRB on O'Donnell. In considering the proper sanction for O'Donnell, the IRB first emphasized that, in signing and filing CCERs that he knew were wrong, O'Donnell committed a "knowing violation [that] undermines the democratic processes of the IBT." IRB Decision at 13. At the same time, however, the IRB noted that "in doing so, O'Donnell did not intend to hide Mr. Currie's participation in his Campaign." *Id.* The IRB therefore concluded that, "[i]n light of the particular circumstances of this case, we find that a nine-month suspension is a sufficient sanction for O'Donnell's misconduct as an officer." *Id.* at 14. Delineating the terms of the suspension, the IRB added that

> [d]uring his suspension, O'Donnell may not obtain employment, consulting or other work, from any IBT or IBT-affiliated entity. If he desires, he may maintain his membership in the IBT; but O'Donnell may not participate in any affairs of the International or Local Union 817 as an officer or employee.

*Id.*

In its response to the IRB Decision, the IBT raises a number of objections to the sanctions imposed. In short, the IBT asserts that "[t]he penalty imposed by the Board is contrary to the Rules under which the Board operates, is contrary to the purpose and objects of the Consent Decree and is inappropriate to the violation." IBT Letter at 3. I will now address each of these objections.

First, the IBT asserts that the IRB "has not given any reason for its apparent view that the penalty imposed by the Union is inadequate. No reason for inadequacy of the penalty was stated either in the Board's January 4 letter, its February 3 letter or its November 13 decision." *Id.* at 4. The IBT claims, therefore, that the IRB violated the IRB Rules, ¶ I.7, which requires that "[i]f the IRB, at any time after it issues its Investigative Report, determines ... that the resolution proposed by the relevant IBT entity is inadequate under the circumstances, the IRB shall notify the IBT affiliate of its view, and the reasons therefor."

Contrary to the IBT's assertion, however, in its January 4, 2000 letter to the IBT, the IRB both informed the IBT of its finding that the IBT's resolution of the matter was inadequate and detailed the reasons for this finding. *See* IRB Hearing Transcript, Ex. 12. Specifically, the IRB noted that "[t]he five contemporaneously filed CCERs falsely stated that Mary Ann Currie was O'Donnell's campaign coordinator when O'Donnell knew this was not true. By falsely certifying that this information was correct on five separate occasions ... O'Donnell intentionally made false representations to the Election Officer ...." *Id.* at 1. The IRB further expressed its view that "whatever motive he may have had, to carry out his personal plan O'Donnell knowingly and intentionally signed and submitted false CCERs. He refused to recognize that his personal goal to chastise Currie did not relieve him from his firm obligation under the consent decree to file accurate CCERs." *Id.* Thus, the IRB fully complied with the IRB Rules.

■ The IBT also argues that the sanction imposed by the IRB "is inappropriate because ... it bears no reasonable relation to the nature of the violation." IBT Letter at 4. According to the IBT, because the violation "was related solely to Mr. O'Donnell's candidacy for the office of International Vice President," the penalty imposed for the violation should "ha[ve] nothing to do with his office as principal officer of Local 817" and should "avoid depriving the membership of Local Union 817 of the services of the person they elected to run their Local Union and [ ] avoid depriving the members of the [IBT] of the services of the International Vice President they elected to serve on the General Executive Board." *Id.*

In reviewing the sanctions imposed by the IRB, I note the instructions of the Second Circuit that I "must sustain the IRB's determination unless [I] find[ ] the penalty unwarranted in law or without justification in fact." *Giacumbo*, 170 F.3d at 144 (citations and internal quotations omitted). Upon consideration of the nature of O'Donnell's violation and the extent of the sanctions imposed, I "have been given no reason to doubt that the IRB imposed [the] sanctions after considering the harm to the IBT, the facts surrounding the violations, the character of the charges and the appropriate type of sanction in deciding how to deal with the violations." *Id.* at 145. Instead, I find that the sanctions were both lawful and justified by the facts of the case.

Somewhat ironically, the IBT argues that "[i]n particular ... the penalty and its timing have the effect of clouding Mr. O'Donnell's ability to freely participate in the [IBT 2000–2001] election process." IBT Letter at 4. The IBT expresses its concern that

> [t]he nine-month length of the suspension coupled with its timing has the un-

fortunate effect of imposing the suspension during the election of Convention delegates at Local 817 (nominations scheduled for January 20, 2001), during the International Union Convention (June 25–29, 2001) at which candidates for International Union office will be nominated, and for much of the 2001 Election Campaign cycle (ballots mailed October 9 and counted November 14).

*Id.* at 5.

Based on the views of the Election Administrator, it appears that O'Donnell's suspension will have little if any adverse effect on his ability to participate in the 2000–2001 election process. *See supra*, note 1. In any event, to the extent that the timing of the sanction overlaps with important dates during the 2000–2001 election cycle, the IBT could easily have mitigated or even fully prevented this "unfortunate effect" had it been more diligent and responsible in its disposition of the case. As long ago as December 3, 1998, the IRB forwarded to the IBT its Investigative Report and recommended charges against O'Donnell. Upon receipt of Keegel's November 1, 1999 decision, the IRB promptly reviewed his finding and sanction and, by letter dated January 4, 2000, the IRB informed Keegel that it found the IBT's resolution inadequate and returned the matter to the IBT for reconsideration. Keegel, however, failed to disturb the original decision, requiring the IRB then to hold a *de novo* hearing and issue a decision. Thus, the IBT had ample time to review the charges and take appropriate action well in advance of the 2001 election cycle. It is only because the IBT repeatedly failed to provide an adequate resolution of the matter that the reasonable nine-month suspension ultimately imposed by the IRB may affect O'Donnell's ability to participate in events taking place in 2001.

Additionally, in light of the IBT's insistence that the sanction should relate specifically to the nature of O'Donnell's violation, it would appear quite appropriate—though perhaps unintended—if his penalty for violating the 1995–1996 Election Rules precluded his participation in segments of the 2000–2001 IBT election cycle. As I recently noted, "this Court bears the ultimate responsibility for ensuring that the IBT is maintained democratically, with integrity, and for the sole benefit of its members . . . . Accordingly, in order to achieve this goal, it is critical that . . . IBT elections are conducted in a fair, open, and democratic fashion." *United States v. International Bhd. of Teamsters ("2000–2001 Access Rule")*, No. 88 Civ. 4486(LAP), 2000 WL 1682963, at *6 (S.D.N.Y. Nov.8, 2000) (citations and internal alterations omitted). Consistent with this goal, it is my hope that O'Donnell's suspension and any coincidental disqualification from participation in the upcoming election process for violating the 1995–1996 Election Rules will serve as a cautionary tale to others in the future.

Likewise, there is a similar irony to O'Donnell's argument that "a sanction which has the effect of barring Mr. O'Donnell from office and employment for a period of mine months is grossly excessive since it would result in the equivalent of a $180,000 fine; it would prevent Mr. O'Donnell from continuing as President of Local 817 where he has served honorably for the past 39 years [and] . . . it would prevent Mr. O'Donnell from continuing as International Vice President." O'Donnell Objections at 3. The fact that a mere nine-month suspension carries such serious consequences, although again perhaps unintended, appears particularly fitting under the circumstances. It seems appropriate that each of the consequences delineated by O'Donnell relates to the high positions of authority, responsibility and trust that he previously held in the IBT and Local 817 and that he now must forfeit as a direct result of his own wrongdoing. *Cf. Simpson*, 120 F.3d at 349 ("[A]s Simpson himself has proudly stated, he was a very high level member of the IBT . . . . It is well within the IRB's discretion to conclude that, precisely because Simpson was a trusted, high-level official in the IBT, his conduct . . . was more culpable.").

Finally, there is no merit to O'Donnell's argument that the IRB acted in an arbitrary and capricious manner in filing charges against him but not against Hoffa who, O'Donnell alleges, engaged in "exactly the same conduct." O'Donnell Response at 4. Contrary to these allegations, Hoffa's conduct differs substantially from O'Donnell's in a number of respects: Hoffa listed Mrs. Currie on a single form; he did not list Mr. Currie separately on the same form; and the "purpose" of the expenditures to Mrs. Currie is described as "consulting," with no reference to "campaign coordinator." *See* IRB Investigative Report, Ex. 17. In any event, decisions such as this are well within the broad prosecutorial and adjudicatory discretion of the IRB, which is "best situated to determine and fix the penalty to impose upon IBT members." *United States v. International Bhd. of Teamsters ("Cimino")*, 964 F.2d 1308, 1311–13 (2d Cir.1992). *See Giacumbo*, 170 F.3d at 144 ("Uneven application of sanctions does not normally render the sanction imposed in a particular case arbitrary and capricious.").

## Conclusion

For the foregoing reasons, Application 90 of the IRB is Granted and the IRB Decision is Affirmed in all respects.

SO ORDERED.